**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Origami Owl LLC, | No. CV-15-00110-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Julie E. Mayo, et al., | |
| Defendants. | |

Origami Owl has moved to dismiss West Coast Charm's antitrust counterclaims. Doc. 52. The motion is fully briefed and neither side has requested oral argument. Docs. 53, 54. The Court will deny the motion.

**I.     Background.**

Origami Owl is in the business of low-priced jewelry. Doc. 20, ¶ 13. The jewelry includes lockets, chains, dangles, tags, bracelets, and earrings. *Id.* Origami Owl sells its products online as well as through a salesforce of independent "designers." *Id.*, ¶¶ 13-14. Origami Owl has registered patents, trademarks, and copyrights that protect its unique designs. *Id.*, ¶ 18. Defendants West Coast Charms, LLC, 5th Avenue Pets, Julie Mayo, and Ann Mayo are also in the business of ornamental jewelry. *Id.*, ¶ 20. Origami brought suit claiming infringement of its intellectual property rights. Doc. 1.

West Coast Charms, LLC ("WCC") filed counterclaims against Origami Owl. Doc. 48. WCC alleges that Origami Owl copies and reproduces jewelry that others have designed. *Id.*, ¶ 2. Origami allegedly discounts its retail prices for jewelry by eighty

percent from its wholesale prices.  *Id.*, ¶ 29.  WCC also alleges that Origami "bull[ies]" competitors with false claims of proprietary intangible asset ownership" (*id.*, ¶ 32) and that competitors cannot compete with Origami's pricing and "army of its so-called designers" (*id.*, ¶ 34).  WCC claims that it owns various copyrights and a trademark that Origami has infringed.  *Id.*, ¶¶ 38-103.

WCC also claims that Origami has violated antitrust laws under the Sherman Act. *Id.*, ¶¶ 104-24.  Specifically, WCC claims that Origami has attempted to monopolize the market and has conspired with its designers to restrain trade.  *Id.* (citing 15 U.S.C. §§ 1-2).  Origami Owl moves to dismiss the antitrust counterclaims.

## II.    Legal Standard.

A party may move to dismiss a counterclaim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In analyzing whether a counterclaim has failed to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  Legal conclusions couched as factual allegations are not entitled to the assumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Furthermore, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## III.   Analysis.

Antitrust laws are designed for "the protection of competition, not competitors[.]" *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).  Section 1 of the Sherman Act makes unlawful "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce[.]"  15 U.S.C. § 1.  Section 2 makes unlawful the attempted or actual monopolization of trade or commerce.  *Id.* § 2.  WCC brings claims under both of these

sections.  Origami Owl objects to these claims on various grounds, which the Court will address in the order presented.

### A.    Relevant Market.

Origami argues that WCC has failed to plausibly allege a relevant market. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999)). Plausibly alleging the size and characteristics of the relevant market is a prerequisite to claiming that a company has sufficient market power to build a monopoly or engage in anticompetitive conduct within that market.  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the relevant] market there is no way to measure [the company's] ability to lessen or destroy competition."); *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 & n.3 (9th Cir. 2008).

"A 'relevant market' is determined by a product market and a geographic market." *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1126 (C.D. Cal. 2008).  "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1298 (9th Cir. 1993) (quoting *Brown Shoe Co.*, 370 U.S. at 325).  "The geographic market extends to the area of effective competition . . . where buyers can turn for alternative sources of supply."  *Tanaka*, 252 F.3d at 1063 (quotation marks and citations omitted).  There is no requirement that the relevant market "be pled with specificity," but a court may dismiss an antitrust claim if its relevant-market definition is "facially unsustainable."  *Newcal Indus.*, 513 F.3d at 1045.

The allegations in WCC's counterclaim are as follows:

23. There is a particular market in the United States with respect to purchasers purchasing on an online basis specially-designed custom costume charms, floating lockets, lanyard lockets, ornamental chains, ornamental plates, ornamental dangles, ornamental tags, necklaces, bracelets and earrings that do not incorporate precious jewels or metals that is typified by high-end jewelers and such specially-designed custom

costume products is known herein as the 'Relevant Products' and the online market in the United States is known herein as the "Market."

24. Customers seeking the Relevant Products, particularly the specific design and/or customization aspect of the Relevant Products, do not have the same ability to acquire such products other than through online means as going to a physical retail outlet does not entail the same type of electronic ordering efficiency and capability as an online market.

25. Customers seeking the Relevant Products do not see fancy diamond or other precious metal jewelry as a substitute for the Relevant Products or vice versa.

26. Customers seeking specific design and customization do not see generic jewelry as a substitute for the Relevant Products.

Doc. 48, ¶¶ 23-24.

WCC has plausibly alleged a relevant market.  The product market consists of the online market for customized, ornamental, and low-priced jewelry.  The geographic market is the United States.  Origami Owl objects to the narrowing of the market to online sales.  Origami argues that local jewelry stores can compete with online sales and that any claim to the contrary is implausible.  Origami emphasizes that "[t]he relevant market must include sellers or producers who have the actual or potential ability to deprive one another of significant levels of business."  Doc. 52 at 8 (citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).

Courts have found a claimant's alleged relevant market to be implausible at the motion to dismiss stage.  In *Tanaka*, a student athlete complained of a university's refusal to allow her to transfer to a different school.  252 F.3d at 1061-62.  For her antitrust claim, she alleged that the "relevant geographic market is Los Angeles and the relevant product market is the 'UCLA women's soccer program.'"  252 F.3d at 1063.  She also alleged that other universities across the country had recruited her.  *Id.*  Relying on this fact, the Ninth Circuit found that numerous universities with athletic programs "compete in the recruiting of student-athletes and, hence, are interchangeable with each other for antitrust purposes."  *Id.* at 1064.  Even though the claimant alleged that the UCLA women's soccer program was "unique," the court found this conclusory allegation to be insufficient.  *Id.* at 1063.

- 4 -

In *Little Rock Cardiology Clinic PA v. Baptist Health*, the claimant alleged that the relevant product market was "the market for cardiology procedures obtained in hospitals by patients covered by *private insurance*." 591 F.3d 591, 596 (8th Cir. 2009) (emphasis added). The claimant also alleged that doctors providing these cardiology procedures can and did "accept payment from sources other than private insurers." *Id.* at 597. Thus, the claimant was attempting to narrow the market to cardiology procedures obtained by patients covered by private insurance, even though the claimant admitted that the doctors accepted public insurance. For that reason, the Eighth Circuit found the alleged relevant market to be implausible. *Id.* at 597-98.

WCC's allegations are not like those in *Tanaka* and *Little Rock*. WCC alleges that the relevant market is online sales of certain types of jewelry. WCC further alleges a reason for narrowing the market to online sales, namely, that customers are unable to acquire these products at local retail stores and these stores do not have "the same type of electronic ordering efficiency and capability as an online market." Doc. 48, ¶ 24. These allegations are not implausible, as was the allegation in *Tanaka* that the market was limited to one university's athletic program. Nor are WCC's allegations internally inconsistent, as were the allegations in *Little Rock*.

Origami Owl may well be correct that WCC's alleged relevant market is unlikely to survive summary judgment. But at this stage, the Court is required to assume the truth of WCC's allegations and to construe them in WCC's favor. *Cousins*, 568 F.3d at 1067. Furthermore, the definition of the relevant market is normally "a factual inquiry for the jury." *Thurman Indus.*, 875 F.2d at 1374.[1]

---

[1] There is one possible inconsistency in WCC's allegations. WCC claims that Origami Owl employs over 50,000 designers "who actually constitute a massive salesforce across the United States[.]" Doc. 48, ¶ 22. If these designers are engaged in person-to-person sales, then WCC's claim that the relevant market is limited to online sales might fail. Origami, however, does not address this inconsistency in its motion to dismiss, as it argues more generally that "there is no plausible reason alleged that non-internet sales are not alternative sources of supply for a consumer seeking to purchase jewelry, and no reason to accept WCC's limitation of the market to online sales activity." Doc. 52 at 9. Furthermore, WCC's allegations regarding these "designers" are vague, and their role uncertain. Construing the allegations in WCC's favor, the Court finds that the nature of the relevant market is a factual matter better resolved in summary judgment

1

### B.   Market Power.

Origami argues that WCC has failed to allege that Origami has "market power" within the relevant market as required for an antitrust claim.  *See Newcal Indus.*, 513 F.3d at 1044.  Market power refers to a company's ability to control output and prices, and its existence "depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995).  A claimant may demonstrate a defendant's market power by: (1) defining the relevant market, (2) showing that the defendant owns a dominant share of that market, and (3) showing that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run. *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 975 (9th Cir. 1999) (quoting *Rebel Oil*, 51 F.3d at 1434).

WCC has plausibly alleged that Origami has market power.  First, WCC has defined the relevant market as the online market in certain types of ornamental jewelry.

Second, WCC has plausibly alleged that Origami owns a dominant share of that market.  *See* Doc. 48, ¶¶ 27 ("[Origami's] sales of Relevant Products in the Market equals or exceeds $250 million annually."), 28 ("[Origami] is the largest seller of the Relevant Products in the Market."), 30 ("[Origami] is able to sell its products within the Market at a significantly reduced price as compared to competitors based upon [Origami's] market power."), 33 ("[Origami's] competitors have lost market share as a direct result of [Origami's] predatory conduct in the Market.").  These allegations do not specify the exact market share that Origami possesses, but construing the allegations in favor of WCC, the Court may reasonably infer that Origami dominates the market.[2]

motions or at trial.  The Court cannot conclude that the allegations fail to state a claim upon which relief can be granted.

[2] The specificity of these allegations distinguishes this case from two cases that Origami cites.  In *POURfect Products v. KitchenAid*, No. CV-09-2660-PHX-GMS, 2010 WL 1769413, at *2 (D. Ariz. May 3, 2010), the plaintiff merely alleged: "By virtue of its influence over its trade customers at the retail level of the market, KitchenAid possessed monopoly power in the relevant market of aftermarket attachments."  In *Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, No. 11-CV-2652-GPC-RBB, 2013

1    Third, WCC has plausibly alleged that there are significant barriers to entry in this

2    market and competitors lack the capacity to increase their output in the short run.  The

3    barriers that WCC alleges are Origami's employment of an "army" of 50,000 designers,

4    Origami's misuse of intellectual property to "bully" competitors, and Origami's

5    predatory pricing.  *Id.*, ¶¶ 29-35.  WCC has further alleged that these barriers have

6    prevented competitors from entering the market and increasing output.  *Id.*, ¶¶ 34-35.

7    Origami faults WCC for failing to detail Origami's alleged "bullying" and misuse

8    of intellectual property; for failing to explain how new entrants' "diminished capability"

9    to compete translates into "significant barriers" to competition; and for failing to state

10   that Origami's dominance in the market affects all competition as opposed to "certain

11   competitors."  The Court finds Origami's objections to be too formalistic.  WCC need not

12   plead every factual detail of its case, and has plausibly alleged that Origami dominates

13   the relevant market and stifles competition.

## C.    Antitrust Injury.

15   Origami next argues that WCC has failed to allege an injury to competition, that

16   is, an antitrust injury.  An antitrust claimant must allege an "antitrust injury, which is to

17   say injury of the type the antitrust laws were intended to prevent and that flows from that

18   which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

19   429 U.S. 477, 489 (1977).  "Antitrust injury does not arise . . . until a private party is

20   adversely affected by an *anticompetitive* aspect of the defendant's conduct."  *Atl.*

21   *Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (emphasis in original).

22   Thus, an antitrust claimant "must plead an injury to competition beyond the impact on the

23   [claimant] . . . . [and] may not substitute allegations of injury to the claimant[] for

24   allegations of injury to competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192,

26   WL 3873074, at *15 (S.D. Cal. July 25, 2013), the plaintiff merely alleged: "Kaiser
27   Defendants are the 'dominant force in the alleged relevant hospital markets, with
     substantial market share and power.'"  In both of these cases, the courts found the
28   plaintiff's allegations regarding market power to be conclusory.  Unlike these cases,
     WCC has set forth specific factual allegations.  These allegations raise a reasonable
     inference that Origami Owl has market power.

1198, 1200 (9th Cir. 2012).  "[A] claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail."  *Id.* (quotation marks and citations omitted).

WCC has plausibly alleged that Origami Owl's predatory pricing has injured competition – an antitrust injury.  Predatory pricing occurs when a company sets prices below the company's marginal costs to drive out competition, and then raises prices above competitive levels to recoup any losses suffered.  *Rebel Oil*, 51 F.3d at 1433-34; *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 (2007).  A company's predatory pricing causes antitrust injury to competitors because they are unable to compete with the predatory company and the market suffers disequilibrium.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990).  "[T]o prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) 'the prices complained of are below an appropriate measure of its rival's costs'; and (2) there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices."  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (citations omitted).[3]

WCC alleges that Origami "is able to sell the Relevant Products in the Market using predatory pricing by discounting its prices for the Relevant Products to retail customers at eighty percent reductions from wholesale pricing" (Doc. 48, ¶ 29); Origami "is able to sell its products within the Market at a significantly reduced price as compared to competitors" (*id.*, ¶ 30); Origami "is able to sell its products within the Market at a

_____

[3] The Supreme Court has used this two-part test in the context of monopolization claims under Section 2 of the Sherman Act.  The law is unsettled as to whether the second part of the test – a dangerous probability of raising prices above competitive levels – applies to claims under Section 1.  *See, e.g.*, *Energy Conversion Devices Liquidation Trust ex rel. Madden v. Trina Solar Ltd.*, No. 13-14241, 2014 WL 5511517, at *4-5 (E.D. Mich. Oct. 31, 2014) (finding that a Section 1 claimant must demonstrate a dangerous probability of recoupment); *Solyndra Residual Trust , by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1042 (N.D. Cal. 2014) ("[A] defendant's recoupment of losses resulting from its below cost pricing need not be alleged to state a claim under § 1.").  The Court finds it unnecessary to resolve this issue now because WCC has plausibly alleged that there is a dangerous probability that Origami will raise its prices above competitive levels.

significantly reduced price as compared to competitors due to the fact that [Origami] engages in Deceptive Copying Acts rather than investing in original creative designs" (*id.*, ¶ 31); Origami's predatory conduct has caused competitors to lose market share (*id.*, ¶ 33); and Origami "has stifled new entrants into the Market by way of new entrants' diminished capability to compete with [Origami's] pricing, [Origami's] army of so-called designers and in fear of [Origami's] bullying tactics involving claims of intellectual property ownership" (*id.*, ¶ 34).

The Court finds these allegations sufficient for a predatory pricing claim.  True, WCC does not specifically allege that Origami's prices are below cost.  But this allegation may be reasonably inferred from WCC's allegations that Origami discounts its retail prices at "eighty percent reductions from wholesale pricing," sells its products at "significantly reduced price[s] as compared to competitors," and is able to set these significantly reduced prices due to "deceptive copying acts" (*i.e.*, by infringing on others' intellectual property).  If the misuse of others' intellectual property is what enables Origami to set low prices, then the Court may reasonably infer that those prices are below cost.

Also true, WCC does not specifically allege that there is a dangerous probability that Origami will set higher prices after it drives out the competition.  But this allegation may be reasonably inferred from WCC's allegations that Origami has engaged in below-cost pricing and thereby increased its market share.  *See Solyndra*, 62 F. Supp. 3d at 1042-43 (finding that Plaintiff alleged a dangerous probability of recoupment by alleging defendants' predatory pricing and increased market share).  If Origami is driving out competition by predatory pricing and misusing intellectual property, then the Court may reasonably infer a dangerous probability that Origami will use its strengthened position to raise prices above competitive levels.[4]

---

[4] For its argument that WCC has not plausibly alleged a dangerous probability of recoupment, Origami cites *Korea Kumho Petrochemical v. Flexsys America LP*, No. C07-01057 MJJ, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008).  In *Korea*, the claimant's sole allegation regarding dangerous probability was: "Given Flexsys's dominance of the U.S. 6PPD market, there was a dangerous probability that it would by

In sum, WCC has plausibly alleged a claim of predatory pricing and thereby alleged an antitrust injury.  Although, as Origami points out, parts of the counterclaim speak only of the injuries that WCC has suffered (Doc. 48, ¶¶ 110, 122), other parts speak clearly of the injuries that competition has suffered due to Origami's anticompetitive conduct.  *See id.*, ¶¶ 34-35.

### D.     Section 2 Attempted Monopolization Claim.

Origami argues that WCC's attempted monopolization claim is defective.  Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]"  15 U.S.C. § 2.  "[T]he statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Pacific Bell*, 555 U.S. at 448 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  "'[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2007) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

Origami argues that WCC has failed to allege Origami's specific intent to monopolize.  The Court disagrees.  "[S]pecific intent . . . may be inferred from conduct [that is] predatory or clearly in restraint of competition[.]"  *Thurman Indus.*, 875 F.2d at 1378; *see also Arminak & Associates, Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1205 (C.D. Cal. 2011) ("Specific intent to monopolize may be inferred from . . . conduct forming the basis for a substantial claim of restraint of trade or conduct that is clearly threatening to competition or clearly exclusionary, but the focus must be on proof

---

its unlawful actions achieve monopoly power in violation of Section 2 of the Sherman Act."  The district court found this to be a legal conclusion, noting also that the claimant had made other allegations that cut against a dangerous probability of recoupment.  Here, by contrast, WCC has alleged that Origami has increased its market share and the manner by which it has done so.

of unfair or predatory conduct." (quotation marks and citations omitted)).[5]   As already noted, WCC has plausibly alleged that Origami Owl is engaged in predatory pricing and that there is a dangerous probability that Origami will recoup its investment by raising its prices above competitive levels, thereby achieving monopoly power.   The Court may infer Origami's specific intent to monopolize from this conduct.

### E.   Section 1 Restraint of Trade Claim.

Origami argues that WCC has failed to allege that Origami and its designers agreed or conspired to restrain trade or commerce.   To state a claim under 15 U.S.C. § 1, a claimant must plead: (1) a contract, combination, or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce; (3) which actually injures competition.   *Brantley*, 675 F.3d at 1197 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)). Unless a claimant alleges a *per se* violation of the Sherman Act (which WCC has not), a court must assess whether an agreement harms or restrains trade under a rule-of-reason analysis.   *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1154 (9th Cir. 2003); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (stating that Section 1 "outlaw[s] only unreasonable restraints" of trade or commerce).   The rule of reason tests "'whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'"   *Id.* at 1156 n.9 (quoting *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918)).

WCC has plausibly alleged a violation of Section 1.   First, WCC has alleged an agreement between Origami Owl and individual "designers," who act as a "salesforce"

---

[5]  In its reply, Origami emphasizes that *Spectrum Sports* overruled Ninth Circuit cases that "had previously ruled that evidence of unfair or predatory conduct could satisfy both the specific intent and dangerous probability elements of attempted monopolization[.]"   Doc. 54 at 13 (citing 506 U.S. 447).   But *Spectrum Sports* was clear that predatory "conduct may be sufficient to prove the necessary intent to monopolize," even though such conduct alone could not prove a dangerous probability of monopolization.   506 U.S. at 459.   Thus, the Court may infer Origami's intent to monopolize from its alleged predatory conduct.

for Origami.   Doc. 48, ¶ 22.   This agreement "binds" the designers "to exclusive contractual restraints to sell only the Relevant Products provided by [Origami] incorporating the copyrights and patents that are the subject of the Deceptive Copying Acts." *Id.*, ¶ 114.  The agreement also includes "price constraints" on "the designers." *Id.*, ¶ 121.  Thus, the agreement between Origami and its designers is alleged to be both an exclusive-dealing agreement and an agreement to fix the maximum price at which the designers may sell Origami's product.

Second, WCC has plausibly alleged that the parties intended to harm or restrain trade or commerce.  An antitrust claimant must show that "the actors had an intent to adhere to an agreement that was designed to achieve an unlawful objective; it is not required that the proof show the actors specifically intended to restrain trade." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993); *see also United States v. Griffith*, 334 U.S. 100, 105 (1948); *Paladin Assocs.*, 328 F.3d at 1153-54.  WCC has alleged that the parties' intended agreement was designed to achieve an unlawful objective, namely, to engage in predatory pricing.  As already explained, WCC has plausibly alleged a claim of predatory pricing, and such an agreement may violate the Sherman Act under the rule of reason.  *See Khan*, 522 U.S. at 22; *USA Petroleum Co.*, 495 U.S. at 339.[6]

Third, WCC has alleged an injury to competition.  This injury consists of the harm imposed by predatory pricing.  In sum, while many of WCC's allegations may be

---

[6] The Court notes that WCC has alleged another way in which the agreement between Origami Owl and its designers may be an unreasonable restraint on trade, namely, that the agreement is an exclusive-dealing agreement.  An exclusive-dealing agreement is one "between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  "'[A]n exclusive-dealing arrangement does not constitute a *per se* violation of section 1.'"  *Id.* (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303-04 (9th Cir. 1982)).  "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'"  *Id.* (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)).  Because WCC's allegations regarding an agreement to engage in predatory pricing suffice to support its Section 1 claim, the Court finds it unnecessary to address whether WCC's allegations regarding the exclusive-dealing agreement also suffice to support its claim.

conclusory, WCC has plausibly alleged a violation of Section 1.

**III.   Conclusion.**

Origami Owl's alleged predatory pricing forms an important part of WCC's antitrust claims.  The Court is mindful that "[i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct the antitrust laws are designed to protect,'" *Pacific Bell*, 555 U.S. at 451 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)), and that the Supreme Court has "carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low," *id.* Nevertheless, WCC has plausibly alleged that Origami Owl is engaged in predatory pricing within a particular market, and the Court will not dismiss WCC's claims at this stage in the case.

**IT IS ORDERED** that Origami Owl's motion to dismiss (Doc. 52) is **denied.**

Dated this 7th day of August, 2015.

David G. Campbell
United States District Judge